FILED

03/27/2026

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 5, 2026

IN RE CHARLEE G., ET AL.[1]

**Appeal from the Circuit Court for Bradley County**
**No. V-23-722        J. Michael Sharp, Judge**

_____

**No. E2025-01010-COA-R3-PT**

_____

This action involves the termination of a mother's parental rights to her minor children. Following a bench trial, the court found that clear and convincing evidence established several grounds of termination and that termination was in the best interest of the children. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, P.J., E.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., C.J., and VALERIE L. SMITH, J., joined.

Jessica M. Conine, Chattanooga, Tennessee, for the appellant, Ashlie R.

Matthew C. Rogers, Athens, Tennessee, for the appellees, Carol and Charles G.

**OPINION**

## I.        BACKGROUND

Charlee was born to Ashlie R. ("Mother") and Tyler G. ("Father") in 2012. Father passed away in 2014. Mother gave birth to a son, Hayden, with a different partner in 2020. The Tennessee Department of Children's Services ("DCS") removed Charlee and Hayden (collectively "the Children") from Mother's custody in August 2021 based upon allegations of drug abuse. The Children were placed together with Charlee's paternal grandparents, Carol and Charles G. (collectively "Grandparents").

_____

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

Mother was granted supervised visitation at Grandparents' discretion and advised that she must (1) complete an alcohol and drug assessment; (2) provide two clean drug screens; and (3) maintain stable housing and employment prior to filing a petition for the return of custody. The Children were later adjudicated as dependent and neglected on June 13, 2022. Mother continued to struggle with addiction and failed to maintain contact.

On December 7, 2023, Grandparents moved to terminate Mother's[2] parental rights and to adopt the Children based upon the following statutory grounds: (1) abandonment by willful failure to remit child support; (2) abandonment by willful failure to visit; (3) the persistence of conditions which led to removal; and (4) failure to manifest an ability and willingness to assume custody of the Children.

The action finally proceeded to a hearing on September 10, 2024. Mother, who appeared late to the hearing, participated via Zoom and was represented by appointed counsel. Grandparents testified concerning their love and care for the Children, describing an idyllic lifestyle on property with approximately 11 acres. They confirmed that they had extended family available to help care for the Children. Grandparents, who were both retired from long-term stable employment, testified that they were capable of financially providing for the Children from their retirement income. They confirmed their desire to adopt the Children. Charles G. ("Grandfather") stated,

> You have them in your home for three years they're – you don't want to lose them. You hear their feet get up and walk the floor at night. It's warming. You know at our age we wouldn't ever think that we would get to hear that again.

He testified that Charlee was doing well in school and involved in extracurriculars. Hayden was also doing well and attending preschool. He stated that Mother last visited in August 2023. He confirmed that Mother visited approximately six or seven times in 2021, less in 2022, and approximately three times between January and August 2023. He agreed that Mother behaved appropriately with the Children, who referred to her as "Mom." However, he stated that at time of removal, he observed Charlee assuming a motherly role with Hayden. Her motherly care for him continued for some time after their placement.

Grandfather testified that Mother had never remitted any form of child support. He testified that Charlee was entitled to receive Father's Social Security benefits of approximately $700 per month; however, Mother retained this income for her own use until he petitioned for its transfer to Charlee in September 2023. They were now saving the money for Charlee's future schooling.

---

[2] Hayden's father was never identified. Grandparents submitted an inquiry to the putative father registry and were advised that a notice of intent to claim paternity had not been filed on Hayden's behalf.

Charlee testified, affirming her Grandparents' assessment of their relationship with herself and Hayden and expressing her desire to be adopted by Grandparents. She indicated that she was happy living with Grandparents and that she also enjoyed spending time with her paternal aunt, Kelsy G. and her boyfriend, Ryan L. Charlee stated that she had observed Mother using drugs and that she was worried about Hayden returning to that environment without her. She was also concerned about Mother's relationships. She explained that she often overheard Mother fighting with men. She professed that Mother sometimes left her alone to care for Hayden without assistance for hours and would also leave her to care for Hayden in the mornings while she slept.

Kelsy G. confirmed her availability to assist with the Children. She and Ryan regularly spent time with them on their own farm. They hosted birthday parties for the Children and took the Children with them on vacations. She recalled that Charlee struggled with anxiety at the time of removal. She stated that they found a therapist for her and also purchased a golden retriever as a companion for her. She continued,

> She's in a better place, but when we first got both of them together I'd say for probably the first 12 months the first person Hayden had to see every day when he woke up was Charlee. And that was he wasn't happy until he saw her. The moment he saw her he was ecstatic. And that took about 12 months for him to understand that she's there for him.
>
> And so for her, I'm concerned about, you know, she is getting to become a young adult what this will mean for her adult life if it continues, if there's never any stability. And then for him he has such a connection to her I just worry about him not having her.

Kelsy attested that she and Ryan would care for the Children if Grandparents were unable. Ryan confirmed his love and concern for the Children and agreed that he would care for them in Grandparents' stead.

Mother expressed her love and concern for the Children and professed that she was currently in a rehabilitation facility to ready herself for the Children's return to her custody. She recalled regular visitation between 2021 and 2022 and stated that she brought toys and activities to visitation. She agreed that visitation lessened in 2022 because she did not have transportation; however, she often spoke with Charlee through SnapChat. She admitted that she visited even less prior to the filing of the termination petition in December 2023. She explained that she has struggled with drug addiction, specifically methamphetamine, and that she was enrolled in a rehabilitation center in Louisiana in October or November 2023. After another relapse, she enrolled herself in a new program in Kentucky on August 6, 2024, where she has remained since that time. She has been drug-free while in the program and hoped to reunite with the Children upon her completion of the program.

Mother conceded that she did not remit child support throughout the custodial episode. She stated that she was unable to maintain employment and only received some income through cleaning houses during the pertinent time period. She estimated that she made approximately $60 per house and that she cleaned two or three houses on a regular basis. She admitted that she spent some money on methamphetamine. She also agreed that she retained Charlee's Social Security benefits during that time, explaining that she needed the money for rent. She asserted that she did not have a stable income due to a lack of transportation. She testified that she lived in an apartment for approximately six months following removal until February 2022, when she moved in with her stepdad. She was not required to pay rent to her stepdad; however, she only stayed there a few months before moving in with a friend. She paid her friend approximately $300 per month in rent until she moved to the rehabilitation program in Louisiana in October 2023 or November 2023.

Linda Renee LaFevers confirmed Mother's placement in the treatment facility in Kentucky. She professed that Mother was participating and progressing through the program and that Mother's next step in the program would be to qualify for intensive outpatient care, where she would be required to live in a home and maintain employment while still in the program for another three to six months.

Following the hearing, the trial court granted the termination petition based upon (1) abandonment by willful failure to remit child support; (2) abandonment by willful failure to visit; and (3) the persistence of conditions which led to removal. The trial court found that termination of Mother's parental rights was in the best interest of the Children. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children.

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*,

140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record

- 5 -

and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.   DISCUSSION

### A.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) abandonment by failure to support; (2) abandonment by failure to visit; and (3) the persistence of conditions which led to removal. Mother did not appeal the court's finding of clear and convincing evidence in support of each ground of termination. However, we will consider each ground in this appeal as required by our Supreme Court. *In re Carrington H.*, 483 S.W.3d at 525–26 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.").

### 1.   Abandonment by failure to support

Abandonment can occur when a parent has "failed to support or [ ] failed to make reasonable payments toward the support of the child" for a period of four consecutive

months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). The statute defines failure to support as a parent's failure "for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). By statute, parents are expected to offer more than "token support," which "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). "Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H).

A lack of willfulness can constitute an affirmative defense to the ground of failure to support. Tenn. Code Ann. § 36-1-102(1)(I). A parent "shall bear the burden of proof that the failure to . . . support was not willful" and must establish the lack of willfulness by a preponderance of evidence. *Id.* Mother's answer to the termination petition was not included in the record before this court. She also does not allege on appeal that her failure to remit support was not willful. Here, the petition was filed on December 7, 2023. The relevant four-month period is from August 7, 2023, through December 6, 2023. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding the day the termination petition was filed and does not include the day petition was filed).

Grandparents testified that they never received any financial support of any kind from Mother. Mother testified that she was unable to maintain employment due to transportation issues. She agreed that she received some income through cleaning houses and that, at times, she used this income to purchase methamphetamine. The record is unclear as to when and for how long Mother received this income. However, it is clear that Mother was physically able to work. Mother also retained Charlee's Social Security benefits for approximately two years following removal until September 2023. Mother testified that her rent was approximately $300 per month before she left for Louisiana in October or November 2023. Yet, Mother never remitted any child support for either child. Under these circumstances, we must conclude that the evidence presented established that Mother had some income from which to remit child support during the pertinent time period, specifically in August 2023 when she retained approximately $700 from Charlee's income and failed to remit support. Accordingly, we hold that there is clear and convincing evidence to support the court's termination on the ground of abandonment by failure to remit child support.

2.      Abandonment by failure to visit

Parental rights may be terminated for abandonment when a parent fails to visit a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than

token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). The burden is on the parent asserting the defense to prove by a preponderance of the evidence that his or her failure to visit was not willful. *Id.*; *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019). Again, Mother's answer to the termination petition was not included in the record before this court. She also does not allege on appeal that her failure to visit was not willful. As discussed previously, the relevant four-month period is from August 7, 2023, through December 6, 2023. Grandparents testified that Mother last visited in August 2023. Accordingly, we hold that there is clear and convincing evidence to support the court's termination on the ground of abandonment by failure to visit.

### 3. The persistence of conditions which led to removal

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The record reflects that the conditions which led to removal in August 2021 were child safety concerns due to drug abuse. While we acknowledge Mother's progress in her current program and commend her for seeking rehabilitation, the evidence confirms that Mother was still not in a position to care for the Children. At the time of the hearing, Mother was only one month into her current treatment program in Kentucky after having relapsed following her attendance at another treatment program in Louisiana. Following our review of the record, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date. The continuation of Mother's relationship with the Children greatly diminishes their chances of early integration into a safe, stable, and permanent home. We affirm the court on this ground of termination.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Mother's parental rights was in the best interest of the Children. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

- 9 -

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing

- 10 -

the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)     When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4)     Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall

always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others). With respect to these factors, the Children have lived with Grandparents for approximately three years with little to no involvement from Mother. The Children are thriving in their current placement with extended family that also offers assistance and support to Grandparents, who have indicated their intent to adopt. Charlee expressed her desire to stay with Grandparents and her extended family and expressed fear of her brother returning to Mother without her there to care for him if Mother struggled with addiction again.

We turn next to the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Mother has failed to establish her ability to provide a suitable home. Charlee recalled observing Mother abusing drugs, leaving her and Hayden unattended, and relying on her to care for Hayden even when Mother was present. Further, Mother was not in a position to provide a stable home at the time of the hearing as evidenced by her current placement in a treatment facility.

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Mother failed to meet the Children's needs prior to removal. She has not exhibited a sense of urgency in addressing the circumstances which led to removal and has not established a lasting adjustment of circumstances.

With regard to support and knowledge of the Children's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P)

(addressing the parent's understanding of their needs), the record reflects that Mother has not remitted child support or any other form of support since the time of removal. Instead, Mother retained Charlee's Social Security benefits for her own personal use.

While we again commend Mother for her efforts at rehabilitation, the prompt and permanent placement of the Children in a safe environment is paramount. Mother simply cannot provide the permanency and safety that the Children need in a timely manner. The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Mother's parental rights was in the Children's best interest.

## V.    CONCLUSION

The judgment of the trial court is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Ashlie R.

s/John W. McClarty
JOHN W. McCLARTY, JUDGE